# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

_____

KATHERINE MCGILL,

                       Plaintiff,

        -vs-

THE UNIVERSITY OF ROCHESTER AND
KAREN MACDONALD,

                   Defendants.

_____

### DECISION and ORDER

### 10-CV-6697-CJS-JWF

## APPEARANCES

For Plaintiff:                     Katherine McGill, *pro se*
                                  9 Maxwell Avenue
                                  Rochester, NY 14619
                                  (585) 441-4093

For Defendants:                Sarah Snyder Merkel, Esq.
                                    The Wolford Law Firm LLP
                                  16 East Main Street
                                  600 Reynolds Arcade Building
                                  Rochester, NY 14614
                                  (585) 325-8013

## INTRODUCTION

**Siragusa, J.** Pending before the Court in this employment discrimination case are two motions: Defendants' motion for summary judgment, Feb. 8, 2013, ECF No. 35; and Defendants' motion to seal certain exhibits submitted by Plaintiff, Sept. 26, 2013, ECF No. 54. For the reasons stated below, the Court grants both applications.

## BACKGROUND

At the time Defendants filed their motion, Plaintiff was represented by counsel. Subsequently, Plaintiff's counsel moved to withdraw and the Court granted his motion. Plaintiff was given ample time, including several adjournments, to obtain new counsel, but was unable to do so, and ultimately proceeded *pro se*. At a status conference on the record held before the Court on June 24, 2013, defense counsel provided Plaintiff with the notice required by *Irby v. New York City Transit Authority*, 262 F.3d 412 (2d Cir. 2001) and this Court's local rules. Merkel Decl. ¶ 4 & Ex. A, Oct. 23, 2013, ECF No. 65-2. In addition, the Court also explained during the June 24 appearance the concept of summary judgment to Plaintiff. Plaintiff has filed a response to Defendants' statement of facts, to which she appended the following: "State of New York, County of Monroe ss: I affirm the above under penalties of perjury. Katherine McGill, September 20, 2013." Pl's Response to Def.s' Statement of Material Facts at 68, Sept. 23, 2013, ECF No. 56. Plaintiff's memorandum of law contains statements of fact and this subscription at the end: "As to all statements of fact made by me in the Argument, I affirm all the above facts under penalties of perjury. Katherine McGill, 9-23-13." Pl.'s Memorandum of Law at 6, Sept. 23, 2013, ECF No. 55. The Court will consider both to be in the nature of affidavits concerning the facts asserted in each document. *See* 28 U.S.C. § 1746 (unsworn declarations under penalty of perjury).

Plaintiff was a long term employee of the University of Rochester, having been initially hired in 1986, and having held various jobs at the University. She made a complaint of racial discrimination in 2003 when she worked in the theater department, and was transferred to the dental department. The dental department eventually restructured. Plaintiff applied for several positions at the University and was interviewed for two. Through an interview with the department of psychiatry, Plaintiff met Ellen Watkins ("Watkins"), the Uni-

versity's director of operations for the medical faculty group (groups of University-employed physicians who practice at Strong and Highland hospitals).

Plaintiff states that Watkins expressed to Plaintiff that she was impressed with Plaintiff's skills and wanted Plaintiff on her team. Watkins referred Plaintiff's resumé to Karen Macdonald ("Macdonald"), a manager in the Medical Facility Group Business Office ("MFGBO"). Plaintiff states that Macdonald would contact Plaintiff to discuss the duties and job description for open positions in Watkins' department. Macdonald and Frances Cohen ("Cohen"), a lead operations coordinator, interviewed Plaintiff for an operations coordinator position. Plaintiff states that the interview lasted about ten to fifteen minutes, that Macdonald said Plaintiff was recommended to her by Watkins and wanted to know when Plaintiff could start, what hours she could work, and what was her current pay. Macdonald offered her a position by telling Plaintiff the human resources department would contact Plaintiff to offer the position officially.

Plaintiff began working as an operations coordinator on February 16, 2009. Along with Plaintiff, the MFGBO had five other operations coordinators: Benedetta Robinson, Mary Sara-Medynski McDonald, Susan Oatman, Joellyn Verna ("Verna") and Sharon Montgomery. Cohen, although a lead operations coordinator, also performed the duties of an operations coordinator. Plaintiff and Benedetta Robinson are both African-Americans, whereas the others are Caucasian.

As an operations coordinator, Plaintiff was assigned to support three groups: obstetrics and gynecology, dermatology and neurology. Her duties included providing consultation and support for the billing offices of various practice groups in the University's Medical Facility Group. Her duties also included preparing for and facilitating monthly meetings with

3

the billing managers of the specific practice groups to which she was assigned. Further, she was required to prepare reports based on various billing and financial data collected by the University Reporting System, then use that data to create additional reports, to create agendas for meetings to discuss the reports with representatives of the assigned departments, and to prepare minutes of the meetings. As an operations coordinator, Plaintiff could also be called upon to complete additional billing-related projects for groups other than those to which she was assigned. For example, at the time she started working for MFGBO, it has been tasked to take over billing for Geriatrics from the Department of Primary Care.

Plaintiff maintains that she was given the same assignments and duties as a Billing Specialist when hired, and was not trained for the coordinator functions until August, some six months after being hired as a coordinator. Plaintiff states that she was assigned to work at a lower classification as a Billing Specialist and submit claims for eight hours a day for five months, and that training for the position for which she was hired was delayed. She also states that no other coordinator was assigned to provide *ad hoc* billing support for eight hours per day and were, instead, allowed to perform their *ad hoc* duties as needed at their leisure.

As she started working for MFGBO, Plaintiff was assigned to assist Cohen at monthly meetings by taking notes and helping to prepare for those meetings. Plaintiff attended monthly meetings for obstetrics and gynecology, neurology and dermatology, and, beginning in March 2009, she prepared minutes for those meetings. It was required that the minutes reflect the various financial reports, provide an overview of the financial and prac-

tice issues from a billing perspective, and detail actions taken to resolve or improve any billing issues. Further, the minutes were relied upon by the University's auditors.

Plaintiff states that the job duty of typing meeting minutes comprised only ten percent of her job functions and was not even mentioned in the job description that was provided to her at her interview. Plaintiff further states that although she was assigned to obstetrics and gynecology, dermatology and neurology, she performed coordinator duties (by preparing reports) only for dermatology and neurology, and that others, including Verna, performed coordinator duties for obstetrics and gynecology. She also states that Macdonald facilitated meetings for the first few months, and then the responsibility was given to Verna. With regard to minutes, Plaintiff states that the first obstetrics and gynecology minutes she typed were reviewed by Macdonald in March 2009 and were fine, without errors and did not need corrections.

With regard to her training, Cohen was responsible for training all operations coordinators and was directly involved in training Plaintiffs. Cohen kept a form showing the training in which Plaintiff participated and kept the form updated. Plaintiff received training from Education Services on February 23 and 26, 2009, and March 16, 17 and 18, 2009, relating to the University's IDEX® billing software. She was also trained on the IssueTrak program, a simple program MFGBO used to track issues through to resolution. Plaintiff states that although hired in February 2009, Cohen did not begin training her until August 2009, and that the training in February was only to perform billing tasks as a Billing Specialist, a position for which, she contends, she was not hired.

On April 29, 2009, July 22, 2009, and August 13, 2009, Cohen expressed concern in email correspondence to MacDonald that Plaintiff was not retaining knowledge of IMX™ electronic document management software and not properly booking meetings through an Outlook™ calendar. On August 24, 2009, Cohen sent an email expressing concern that Plaintiff gave out Cohen's cell phone number in an "out of office" automatic message from Plaintiff's email account.

On August 24, 2009, Cohen sent Plaintiff an email concerning work that Plaintiff was responsible for completing for the September obstetrics and gynecology, neurology and dermatology monthly meetings. Plaintiff states she was not responsible to perform coordinator duties, that others were responsible for those departments and she acted merely as a typist for Cohen and Verna. Defendants state that Verna and Cohen had informed Macdonald that Plaintiff was having difficulty performing her job functions and generating appropriate meeting minutes. On September 23, 2009, Macdonald met with Plaintiff to discuss Plaintiff's job performance. Plaintiff states that this meeting was merely to start her training, and was not a performance review. Plaintiff expressed her view to Macdonald that Cohen and Verna, who had been assigned to train Plaintiff, were too overwhelmed with their own work to give attention to Plaintiff's training. Plaintiff further states that Macdonald did not address any issues, but only called Plaintiff sheepish and made Plaintiff feel humiliated by criticizing her about files, folders, papers being messy, and complained about the way Plaintiff held her pens and carried her folders. Plaintiff states she asked Macdonald why she did not like her, and then Plaintiff said maybe it would be for the best if she looked for another job. In that regard, both agreed to call human resources to see if Plaintiff could obtain a transfer.

Plaintiff and Macdonald met on September 25, 2009. According to Plaintiff, the performance issues addressed at this meeting consisted of ones involving Verna and Cohen, not her, and that Macdonald sent emails to them to resolve the problems. Plaintiff states she asked Macdonald to train with another employee in the office, and that, while Macdonald refused, employees did train Plaintiff on the sly. Plaintiff states that Macdonald focused on whether Plaintiff had contacted human resources to obtain a transfer, and Plaintiff told her that she had decided to stay in MFGBO.

Responding to Macdonald's email, Verna claimed she discussed the August 26, 2009 obstetrics and gynecology monthly meeting minutes with Plaintiff on September 14, 2009, and was still waiting to receive them. Plaintiff states that she was not responsible for those minutes until her training was complete in November 2009, and that she told Macdonald that the minutes were current, but that Verna kept having her retype them after reviewing them. On October 2, 2009, Verna sent an email to Macdonald containing her comments on the errors she identified in the August 26 minutes. Plaintiff contends that any deficiencies were the responsibility of Verna, since Plaintiff was not yet trained.

On October 27, 2009, Macdonald met with neurology billing manager Karen Calabro ("Calabro"), who expressed concerns about inaccuracies in meeting minutes. Plaintiff states that she was not responsible for the minutes as her training had not yet been completed. Instead, she states that Cohen was the responsible party and Plaintiff was merely the typist.

On November 2, 2009, Cohen sent Macdonald an email stating that Plaintiff had twenty-seven open issues that had been listed as inactive for over ten days in the Is-sueTrak program. Plaintiff states that, since she was on vacation, her issues would reflect

the lack of activity, but that this did not mean she did not work on the issues or bring them to resolution, which can sometimes take years.

On November 18, 2009, at the monthly neurology meeting, Macdonald learned that Calabro was angry about the format of certain reports, what she perceived as errors. Macdonald ascertained that the information was accurate, but expressed in an unfamiliar format. Macdonald Decl. ¶ 18, Feb. 8, 2013, [ECF No. 37](). After the meeting, Macdonald told Plaintiff that when Plaintiff was trying to explain the situation to Calabro, she raised her voice and the conversation deteriorated into an unproductive exchange. Instead, Macdonald counseled, Plaintiff should never raise her voice at a customer and try to remain diplomatic. *Id.*

On November 23, 2009, Calabro sent Macdonald an email complaining about errors she found in meeting minutes, the backlog of minutes, and the fact that Plaintiff had sent Calabro minutes from a dermatology meeting, not neurology. Plaintiff states she did email dermatology minutes to Calabro. Calabro suggested that Cohen be re-assigned to neurology.

Macdonald reviewed the October 28, 2009 obstetrics and gynecology meeting minutes and noted they erroneously listed Verna as being in attendance. Plaintiff states that Vera was assigned to obstetrics and gynecology and was responsible for the meeting minutes.

On November 24, 2009, Macdonald and Plaintiff met to discuss Calabro's complaint. At the meeting, Plaintiff indicated that the errors were Cohen's, not hers.

Macdonald and Plaintiff met again on December 2, 2009, to discuss Plaintiff's work performance. Plaintiff states that this was not a performance meeting, since Macdonald

met with coordinators weekly to discuss issues. Rather, Plaintiff characterized the meeting as a nit picking training session. In any event, after that meeting, Macdonald discussed Plaintiff's performance issues with Watkins and the human resources department.

Subsequently, Macdonald reviewed the December 9, 2009, obstetrics and gynecology minutes which Plaintiff had prepared and found errors, particularly with the use of certain acronyms "NPI" and "TP," which Plaintiff had failed to capitalize and identify. Plaintiff states that she copied information from Macdonald's email, which Macdonald at first indicated was erroneous, until Plaintiff pointed out that the information came from Macdonald. Plaintiff sent the final minutes to obstetrics and gynecology on December 22, 2009 at 3:35 PM. Plaintiff's office calendar, printed in February 2010, showed that the December 22, 2009, obstetrics and gynecology meeting was scheduled for 9:00 AM. Plaintiff states that the meeting minutes for obstetrics and gynecology had been backlogged since Verna was three months behind and that Plaintiff doubled her workload as soon as her training was done in November 2009 to bring the department current.

On December 16, 2009, Macdonald drafted a performance action plan, which the parties also referred to as a performance improvement plan, or PIP. Macdonald and MFG-BO administrator Terry Masiello ("Masiello") met with Plaintiff on December 18, 2009, about the PIP. They met again on December 23, 2009, and at that time, Plaintiff signed the PIP. Plaintiff states she told Macdonald and Masiello that having worked for the University for 23 years, she had never had a blemish on her record and that if they did not want Plaintiff working in their department, they should say so, instead of trying to make her look incompetent.

On December 23, 2009, Macdonald, Masiello and Plaintiff met regarding the PIP, which Plaintiff signed, since it had been amended to remove information which Plaintiff claimed was not true. Her signature acknowledged receipt of the PIP. At the meeting, Plaintiff was assigned 212 patient pre-verification registrations related to a project MFGBO was working on for the School of Nursing. Macdonald told Plaintiff the registrations should be completed by December 31, 2009. Plaintiff states that by assigning her to verify insurance registrations for 212 flu shot encounters in six days, along with her regular work, Macdonald was setting her up to fail. Each registration, she states, took 13 minutes, and was normally a billing specialist's task, not a coordinator's task. On December 29, 2009, Macdonald, Masiello and Plaintiff met again. Plaintiff had completed approximately 50 of the 212 verifications.

In an email dated January 2, 2010, Plaintiff informed Macdonald that because neither Macdonald nor Masiello had given her permission to work in the office over the holiday, she had not completed the School of Nursing project by the deadline of December 31, 2009. Plaintiff states that she worked on January 2, 2010, a Saturday, and completed the project prior to the start of the next business day.

Plaintiff also informed Macdonald on January 2 that she would complete the meeting minutes for the December 22, 2009, obstetrics and gynecology meeting by January 4, 2010. She in fact completed them the morning of January 5, 2010. Plaintiff counters that she completed the minutes at home on January 3, 2010, and that when Macdonald reviewed the minutes, she found errors similar to the ones identified in the December 9 minutes, namely the lack of capitalization and identification of the acronyms "NPI" and

"TP." Further, Macdonald noted that the initial draft showed that Addie Samuels attended the meeting, but she did not.

On January 6, 2010, Macdonald drafted a PIP Summary Review Assessment. In that assessment, she noted that Plaintiff had not completed the School of Nursing project on time, had not completed the December 22, 2009, obstetrics and gynecology meeting minutes on time, and made errors in those minutes. Plaintiff states that the School of Nursing project was completed and that the December 22 minutes were done on time. Plaintiff received a letter of termination on January 6, 2010, with a termination date of March 15, 2010. Plaintiff states that she asked Watkins for a reference and she responded she would be happy to be a reference for Plaintiff.

Macdonald wrote a letter to Watkins dated October 28, 2009, in which Macdonald requested the creation of a new operations coordinator position, which Watkins authorized. Plaintiff states that Macdonald created a lower position and supervisor position for the School of Nursing project and geriatric billing project that had originally been assigned to her and hired a man in October 2009 to fill that position. According to Plaintiff, this individual then took over some of the projects she had been doing when she was first hired. Defendants state that the new position was first offered to Sheila McCaffrey, who initially accepted it, then rescinded her acceptance. Plaintiff states that Macdonald announced only that she was hiring a supervisor, and never announced that she was creating a new position in October for a coordinator.

On December 17, 2009, the MFGBO sought permission to fill the vacant "Sheila McCaffrey" position, identified as job number 165865. Plaintiff states that Macdonald never posted the position in the department, which was a requirement of University policy. Karen Bridge ("Bridge") was hired to fill job number 165865. Plaintiff states:

> U of R assigns Job numbers to the requisition that opens or creates the position.

> The job number is not assigned to a particular person.

> The requisition number is created to open a position to hire in that classification.

> Hiring Karen Bridge to a job number that was attached to replace Shelia McCaffery does not signify that Bridge was hired to replace that person. The number was used to create a position (Coordinator Position). I worked as a manager at U of R and has [sic] hired staff to replace positions.

> On Br[i]dge's first day of work I gave Bridge my files for OB/GYN, Neurology, Dermatology out of my desk drawer.

> Bridge sat in a cubical down from me[]. My name was removed from the board and replaced with the name "Karen Bridge."

> Fran Cohen began training her immediately. I witnessed Bridge doing my job and being named my replacement.

> It was announced in a staff meeting that I was not going to be performing Coordinator duties and Mac[d]onald welcomed Karen Bridge to take over my duties as Coordinator.

> I was given all other coordinators projects SON encounters that they didn't do until my last day of work.

> I, made copies, filed, and worked on the same simple projects as I did when I was hired in February 2009.

Pl.'s Response to Statement 70, Sept. 23, 2013, ECF No. 56. Defendants state that an HRMS Form 600, dated March 25, 2010, reflects MFGBO's eventual request to fill Plaintiff's position. Plaintiff states:

A HRMS form is created to replace a[n] Operation Coordinator position.

MFGBO has 6 operation Coordinators.

A person can be hired to a HRMS requisition form not attached to the person that terminate or resigned.

A person is hired on a req.

*Id.* at Statement 71.

Plaintiff's complaint raises claims under Title VII of the Civil Rights Act of 1964, 41 U.S.C. § 1981, 42 U.S.C. § 1981a,[1] and Article 15 of the Executive Law of New York. Compl. ¶ 1.

## STANDARDS OF LAW

### *Summary Judgment Motion*

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a *prima facie* showing that the standard for obtaining summary judgment has been satisfied." 11 Moore's Federal Practice ' 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew,* 75 F.3d 98, 107 (2d Cir. 1996) (cit-

---

[1] 42 U.S.C. § 1981 is a damages provision.

ing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert. denied*, 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249. "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir. 1993). The parties may only carry their respective burdens by producing evidentiary proof in admissible form. Fed. R. Civ. P. 56(c)(1)(B). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Moreover, since Plaintiff is proceeding *pro se*, the Court is required to construe her submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

### Title VII

Title VII "makes it unlawful for an employer to discriminate against any individual with respect to the 'compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.' 42 U.S.C. ' 2000e-2(a)(1)."

*Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 436 (2d Cir.

1999).

**New York Human Rights Law**

New York Executive Law ' 296 provides in pertinent part as follows:

1. It shall be an unlawful discriminatory practice:

(a) For an employer or licensing agency, because of the age, race, creed, color, national origin, sexual orientation, military status, sex, disability, pre-disposing genetic characteristics, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, condi-tions or privileges of employment.

N.Y. Exec. Law ' 296(1) (McKinney's 2007). The Court notes that the elements of Title VII

and New York Executive Law ' 296 claims "can be analyzed, for purposes of determining

sufficiency of the evidence, in a manner virtually identical to those under Title VII." *Gal-*

*lagher v. Delaney*, 139 F.3d 338, 345 (2d Cir. 1998).

**Section 1981 and McDonnell Douglas**

The Second Circuit recently summarized the law with regard to a claim under 42

U.S.C. § 1981 and the burden-shifting analysis used by the courts to evaluate summary

judgment motions in discrimination cases:

For a claim of employment discrimination under 42 U.S.C. §§ 1981 and 1983, we apply the familiar burden-shifting framework set forth by the Su-preme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 123 (2d Cir.2004).

[A] plaintiff must first establish a prima facie case of discrimination. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment action. If the employer meets this burden, the presumption of intentional discrimination dis-appears, but the plaintiff can still prove disparate treatment by, for instance, offering evidence demonstrating that the employer's ex-planation is pretextual.

*Raytheon Co. v. Hernandez,* 540 U.S. 44, 50 n. 3, 124 S. Ct. 513, 157 L. Ed. 2d 357 (2003) (citation omitted). When the defendant offers a legitimate, nondiscriminatory reason for the adverse employment action, the burden is on the plaintiff to point to evidence that reasonably supports a finding of prohibited discrimination; otherwise, the defendant is entitled to summary judgment. *Farias v. Instructional Sys., Inc.,* 259 F.3d 91, 98 (2d Cir. 2001). "Of course, to defeat summary judgment ... the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Back,* 365 F.3d at 123 (internal quotation marks and brackets omitted).

*Garcia v. Hartford Police Dept.*, 706 F.3d 120, 127 (2d Cir. 2013).

## ANALYSIS

Plaintiff contends there is an apparent question of fact with regard to whether Macdonald was told to hire her. Pl.'s Mem. of Law 2–3 ("Did Macdonald Hire Me?"), Sept. 23, 2013, [ECF No. 55](). Her argument is, "[t]his was a $42,000 per year salaried job with benefits, and unlikely that Macdonald would hire one after a fifteen minute interview. It is a question of fact as to whether she was told to hire me although Watkins as an employee of the hospital does not admit this in her deposition." *Id.* at 3. Undisputed is that Watkins, who was Macdonald's supervisor, gave Macdonald three resumés with the comment that any of the three would make good operations coordinators if Macdonald wanted to interview them. Watkins Dep. at 22:10–20. Plaintiff's claim that Macdonald's interview lasted only fifteen minutes is contradicted by Plaintiff's deposition testimony, in which she was asked, "How long was that interview approximately?" and responded, "Forty-five minutes." McGill Dep. 22:21-22. The Court finds no material question of fact as to whether Macdonald hired Plaintiff.

Plaintiff also argues that when she was hired into MFGBO, she was tasked to perform the duties of a lower level position of a biller, which position was then vacant, until that

position was filled with a trained candidate. Pl.'s Response to Cohen Decl. at 2, Sept. 23, 2013, [ECF No. 57](). Plaintiff stated in her submissions in opposition to Defendants' motion that billing duties took up her entire work day for either six, five or four months. *Id.* at 6 (six months); Pl.'s Statement of Material Facts at 14 (five months); Pl's Statement of Material Facts at 15 (four months). Nevertheless, Plaintiff also states that she performed operations coordinator duties during the first months of her employment, preparing for meetings, and attending the meetings, and preparing minutes of the meetings. Pl's Statement of Material Facts 17; Pl's Response to Cohen Decl. at 2, 6; Response to Macdonald Decl. at 16–17, Sept. 23, 2013, [ECF No. 57-1]().[2] At her deposition, Plaintiff stated she started preparing minutes in March. McGill Dep. 62:14–16. And contrary to her unsworn statements filed in opposition to Defendants' motion, she testified at her deposition that the draft dermatology meeting minutes of June 2009 were created by her from notes she took while attending the meeting, and sent to Cohen only for Cohen's review. McGill Dep. 110–10–112:5.

Plaintiff contends that she was fired by Macdonald so that Macdonald could hire her friend, Karen Bridge, to fill Plaintiff's position, and Defendants assert that Karen Bridge was hired to fill a newly-created operations coordinator position. Defendants have provided proof, which they claim Plaintiff has not credibly disputed, that Watkins gave permission for the creation of a new operations coordinator position on October 28, 2009, well before Plaintiff was placed on the PIP. Pl.'s Statement of Material Facts at 46. Nothing submitted by Plaintiff raises a material issue of fact with Watkins's statement that she gave Macdon-

---

[2] "Please, note, that the first time I typed minutes for the OB/GYN department was in March 2009; one month after my hire date. I attended that meeting with Macdonald. The reports were prepared by other coordinators and Macdonald facilitated the meeting. At that meeting I took notes and typed the minutes. ¶ Immediately after typing the OB/GYN minutes on March 2009, I asked Macdonald to review and approved the minutes. Macdonald replied in an e-mail the minutes were fine

17

ald permission to increase the number of operations coordinators by one. Watkins Dep. 51:18–52:3. Watkins' approval of Macdonald's request was also approved by Watkins's boss, Martin Haibach. *Id.* 52:4–11. Plaintiff does not dispute that Sheila McCaffery was offered this new position. Pl.'s Statement of Material Facts at 65. Further, Defendants' proof shows that Plaintiff's operations coordinator position was actually filled by Chettie Fontaine, who began work in June 2010. Macdonald Decl. ¶ 4, Jul. 7, 2011, ECF No. 16-2. Karen Bridge eventually took the open position and worked side-by-side with Plaintiff. McGill Dep. at 184:2–8.

Plaintiff testified with regard to her departure in March 2010. She stated that on the fourth or fifth,[3] Macdonald told her to pack up her desk and get out, even though her final date was not until March 15. Plaintiff kept her ID card until March 15. McGill Dep. 90:2–5, 21–24. Plaintiff, in a February 12, 2010, email to Macdonald, had requested vacation time from Monday March 8 through Thursday March 11. *Id.* 95:15–25, 96:2–5. She later asked to cancel the vacation time. *Id.* 96:11–25. As of March 5, 2010, it appears from the evidentiary proof that Plaintiff's last work days would have been Friday, March 12, and Monday, March 15, 2010.

Defendants have entered evidentiary proof of their contention that Plaintiff suffered from several performance deficiencies in her position. The minutia of the exact deficiencies consume a significant amount of space in the papers, but nowhere is the issue of race as a

---

with no errors and that. I did a good job and there was nothing to correct." Pl.'s Response to Macdonald Decl. at 16.

   [3] Earlier in her deposition testimony, Plaintiff testified that the date was March 5, 2010. McGill Dep. 24:3–5.

motivating factor mentioned, alluded to, or inferred. However, Plaintiff relies on Macdonald's use of the word, "sheepish,"[4] and argues that this term was in essence a racial slur.

In this regard, at her deposition, Plaintiff testified as follows:

A. I actually started with Fran [Cohen]. I told Fran that—me and Fran used to get yelled at by Karen MacDonald.

She took us in the office and scolded us like we were kids, yell at us, pointed her fingers in our faces.

I told Fran, I said, "We don't have to be subject to this type of treatment."

Fran said, "There's nothing we can do. There's nothing we can say. Nobody is going to believe us."

I spoke to my HR rep. I told her the same thing and she said, "That's the way it is in that department" and to get out.

Q. Who is your HR rep?

A. It was Kristen. What is Kristen's last name?

Q. If you can't recall that's okay. When did you speak with Kristen?

A. I spoke to Kristen the next day after Karen yelled and pointed her fingers in my face.

Q. That's when you were—you said she did that to you and Fran—

A. She did it to me more than once, but she did it to me and Fran together in a conference room.

Q. Do you remember what month that was?

A. December, November. She called me names—Karen did. She called me—sheepish.

---

[4] According to the Oxford English Dictionary, sheepish means resembling sheep or their characteristics, such as meek, innocent, simple, silly, fearful, timorous, mean-spirited, bashful, awkward in the presence of others. Earliest uses of the word date from 1200 C.E. Oxford English Dictionary, "sheepish," *available at* http://www.oed.com (last accessed October 25, 2013). The Merriam-Webster dictionary defines sheepish as resembling a sheep in meekness, stupidity, or timidity, or affected by or showing embarrassment caused by consciousness of a fault as in a sheepish grin. Merriam-Webster dictionary, "sheepish," *available at* http://www.merriam-webster.com (last accessed October 25, 2013).

Q. Anything else?

A. Sloppy.

Q. Anything else?

A. Those are the main words she used.

McGill Dep. 84:4–85:10. In her memorandum of law, Plaintiff argues that Macdonald,

> didn't use "Black Sheep" because she know that would be a direct racial slur. I was single [sic] out in her scheme because of my race; I was treated as a second class citizen as she thought I was a stupid, dumb, scary black girl (sheepish) who would not understand or figure out her plot to fire me and re- place me with hiring her white friend.

Pl.'s Mem. of Law at 3–4.

As the U.S. Supreme Court stated in *Vance v. Ball State University*, 133 S. Ct. 2434 (2013), "Title VII imposes no 'general civility code.'… It does not reach 'the ordinary tribula- tions of the workplace,' for example, 'sporadic use of abusive language' or generally boor- ish conduct." *Vance*, 133 S. Ct. at 2455 (citations omitted). What the evidentiary proof be- fore the Court shows is that Macdonald hired Plaintiff on the recommendation of Watkins and after Macdonald interviewed Plaintiff. Macdonald criticized Plaintiff's work, and deter- mined after assessment that Plaintiff was not meeting her requirements for the position of operations coordinator. Macdonald then terminated Plaintiff. No evidentiary proof shows that the termination was racially motivated, or done in retribution for Plaintiff's exercise of a protected activity. In short, the volumes of depositions, declarations, emails and other proof presented on this motion show that Plaintiff, despite her 23 years of University employ- ment, was not suited to the operations specialist job and, for that reason, was terminated.

Turning to the motions to seal, the Court determines they are "judicial documents" as that term is defined by case law, and, therefore, a common law presumption of access

attaches. *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119–20 (2d Cir. 2006). The portions sought to be sealed involved an employee who is not a party to this case and whose work history is not relevant to Plaintiff's claim in this lawsuit. Therefore, the Court determines that the balance tips decidedly in favor of protecting the privacy of the non-party.

**CONCLUSION**

For the reasons stated above, Defendants' application for summary judgment, ECF No. 35, is granted. The Clerk is directed to enter judgment for Defendants. Further, the Court finds that Defendants have provided sufficient reasons for approving their motions to seal, ECF No. 54 & ECF No. 66, and those applications are also granted.

DATED:     November 6, 2013
           Rochester, New York

                              /s/ Charles J. Siragusa
                              CHARLES J. SIRAGUSA
                              United States District Judge